[Cite as *E.V. v. R.V.*, 2020-Ohio-5414.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

E. V.

    Appellee

    v.

R. V.

    Appellant

C.A. No.     29691

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CV 2020-01-0022

DECISION AND JOURNAL ENTRY

Dated: November 25, 2020

SCHAFER, Judge.

{¶1} Respondent-Appellant, R.V., appeals the judgment of the Summit County Court of Common Pleas, Domestic Relations Division, adopting the magistrate's granting of a protection order. For the reasons that follow, this Court reverses.

I.

{¶2} Petitioner-Appellee, E.V., filed a petition for a civil stalking protection order ("CSPO") pursuant to R.C. 2903.214 on January 3, 2020. E.V. requested an order of protection from R.V. In the petition, E.V. described the nature of the conduct that caused her to believe that R.V. will cause her physical harm or mental distress as contact that occurred in 2016 during a math class where the parties sat at the same table, and recently sent "evidence of activity," though the nature of such activity is not indicated. The trial court granted E.V.'s request for an ex parte protection order and set the matter for a full hearing.

{¶3}    On January 17, 2020, a magistrate conducted the full hearing on the matter.  E.V. appeared at the hearing represented by counsel.  While R.V. did not appear at the hearing, the magistrate stated on the record that she received a phone call from a woman claiming to be from the office of an attorney representing R.V. and asking for a continuance.  However, the magistrate observed that no one "ever filed a motion or a notice of appearance on behalf of" R.V.  The magistrate looked for R.V. in the courthouse, waited approximately one-half hour, and, after confirming that R.V. had been personally served with the petition but failed to appear, the magistrate proceeded with the hearing in his absence.  E.V. testified at the hearing and presented the testimony of one other witness: Officer Tyson Dinda of the Hudson Police Department.

{¶4}    On January 21, 2020, counsel for R.V. filed a notice of appearance in the case.  The magistrate issued an order on January 24, 2020, granting the CSPO.  The magistrate found that R.V. has knowingly engaged in a pattern of conduct that caused E.V. to believe that R.V. will cause her (E.V.) physical harm or has caused her (E.V.) mental distress.  The order granting the petition prohibited R.V., inter alia, from having contact with E.V., ordered R.V. to maintain a distance of 500 feet from E.V., and ordered R.V. to turn over to law enforcement all deadly weapons in his possession effective through January 17, 2025.  The trial court approved and adopted the magistrate's granting of the protection order.

{¶5}    On February 5, 2020, R.V. filed objections contending that the decision to grant the CSPO was contrary to applicable law.  R.V. asserted that the evidence presented in support of the petition failed to meet the burden necessary to establish menacing by stalking in violation of R.C. 2903.211.  Further, R.V. argued that "the court proceeded to hold a hearing on the matter despite multiple calls from Counsel's office informing the court that [R.V.] was represented, and that counsel was delayed" in another hearing that ran "uncharacteristically long."  Consequently, R.V.

contended, he was deprived of the opportunity to dispute the allegations and denied due process. R.V. filed transcripts contemporaneously with the objection, but requested leave to file a supplemental brief in support of his objection and requested an oral hearing. E.V. replied in opposition to R.V.'s objection.

{¶6} The trial court issued an order on February 11, 2020. The court noted that it previously adopted the magistrate's granting of the CSPO and that R.V. timely filed objections to that decision. The trial court denied R.V.'s request for an oral hearing and request for leave to file an additional brief on the grounds that the requests were "unsupported." The trial court stated that the CSPO contained no defects on its face, that there "is insufficient evidence to support the denial" of the CSPO, that there is no evidence that the magistrate abused her discretion by including or excluding specific terms of the order, and "on thorough review of the order, the record, and the briefs filed in this matter," determined that no substantive or procedural errors were present. The trial court then stated that R.V.'s objections to the CSPO were overruled.

{¶7} R.V. timely appealed the trial court's order and raised three assignments of error for our review.

II.

### Assignment of Error I

**The trial court erred when it granted a civil protection order against [R.V.] when the evidence was insufficient to sustain such a decision.**

{¶8} In his first assignment of error, R.V. argues that the trial court's order granting a CSPO must be reversed because E.V. failed to prove each element of menacing by stalking.

{¶9} Menacing by stalking is prohibited by R.C. 2903.211. Pursuant to the statute, no "person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person * * * or cause mental distress to the other

4

person * * *." R.C. 2903.211(A)(1). Independent of the criminal penalties for a violation of R.C. 2903.211, R.C. 2903.214 provides a civil remedy in the form of a protection order for stalking victims.

{¶10} R.C. 2903.214(C) states that a person may seek relief under this section by filing a petition with the court. A petition for a CSPO shall contain or state all of the following:

> (1) An allegation that the respondent is eighteen years of age or older and engaged in a violation of [R..C. 2903.211] against the person to be protected by the protection order or committed a sexually oriented offense against the person to be protected by the protection order, including a description of the nature and extent of the violation;
>
> * * *
>
> (3) A request for relief under this section.

R.C. 2903.214(C). "After an ex parte or full hearing, the court may issue any protection order, with or without bond, that contains terms designed to ensure the safety and protection of the person to be protected by the protection order * * *." R.C. 2903.214(E)(1)(a).

{¶11} The provisions of Civ.R. 65.1 apply to special statutory proceedings under "R.C. 2903.214 providing for [stalking] and sexually oriented offense civil protection orders[.]" Civ.R. 65.1(A). A court may refer these proceedings to a magistrate, Civ.R. 65.1(F)(1), and, after conducting a full hearing, the magistrate shall grant or deny a protection order, Civ.R. 65.1(F)(3)(a). "When a magistrate has denied or granted a protection order after a full hearing, the court may adopt the magistrate's denial or granting of the protection order upon review of the order and a determination that there is no error of law or other defect evident on the face of the order." Civ.R. 65.1(F)(3)(c)(ii). The court can modify or reject the magistrate's order. Civ.R. 65.1(F)(3)(c)(iii).

{¶12} A party may object to the trial court's action with respect to a magistrate's granting or denial of a magistrate's order. Civ.R. 65.1(F)(3)(d). Civ.R. 65.1(F)(3)(d)(i) provides that

> [a] party may file written objections to a court's adoption, modification, or rejection of a magistrate's denial or granting of a protection order after a full hearing, or any terms of such an order, within fourteen days of the court's filing of the order.

When filing objections pursuant to Civ.R. 65.1(F)(3)(d), the objecting party has the burden to show "that an error of law or other defect is evident on the face of the order, or that the credible evidence of record is insufficient to support the granting or denial of the protection order, or that the magistrate abused the magistrate's discretion in including or failing to include specific terms in the protection order." Civ.R. 65.1(F)(3)(d)(iii). Objections based upon evidence of record must be supported by a transcript of the evidence submitted to the magistrate or an affidavit of that evidence if a transcript is unavailable. Civ.R. 65.1(F)(3)(d)(iv). Although the court's order adopting, modifying, or rejecting a magistrate's denial or granting of a protection order after a full hearing is a final, appealable order, a party must timely file objections to such an order prior to filing an appeal. Civ.R. 65.1(G).

{¶13} Civ.R. 65.1(F)(3)(c) provides the trial court with some discretion to adopt, modify, or reject the magistrate's denial or granting of a protection order. Still, in order to grant a CSPO pursuant to R.C. 2903.214, "the trial court must find that the petitioner has shown by a preponderance of the evidence the respondent committed an act against the petitioner that would constitute menacing by stalking" in violation of R.C. 2903.211. *A.S. v. P.F.*, 9th Dist. Lorain No. 13CA010379, 2013-Ohio-4857, ¶ 6. Accordingly, "[b]ecause [R.V.] challenges the sufficiency of the evidence[1], "we must determine whether, viewing the evidence in the light most favorable to

---

[1] In his merit brief, R.V. asserts that abuse of discretion is the applicable standard of review for his first assignment of error. Although some aspects of an order granting a CSPO—such as the scope and specific terms of the order—may be reviewed for an abuse of discretion, R.V.

[E.V.], a reasonable trier of fact could find that [E.V.] demonstrated by a preponderance of the evidence" that each element of menacing by stalking under R.C. 2903.211 had been met such that "a civil protection order should issue." (Internal quotations and citation omitted.) *K.N. v. Render*, 9th Dist. Medina No. 19CA0018-M, 2019-Ohio-3981, ¶ 15. "A sufficiency challenge tests the adequacy of the evidence." *J.D. v. G.D.*, 9th Dist. Medina No. 18CA0050-M, 2019-Ohio-4391, ¶ 11, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 11.

{¶14} R.V. contends that the evidence does not show a pattern of conduct closely related in time. Regarding the "knowing" element, R.V. argues that there is no evidence in the record that he sent any messages that were intended to be communicated to or shared with E.V. Therefore, R.V. argues he could not have been aware that his conduct would cause E.V. mental distress or cause her to believe that he would physically harm her. Finally, R.V. argues that there is insufficient evidence to show that the messages could have caused E.V. to believe that R.V. would cause her physical harm or to have caused her mental distress. R.V. contends that, when considered in the proper context, the messages do not indicate any threat of harm to E.V.

{¶15} R.C. 2903.211, the menacing by stalking statute, provides in pertinent part:

(1) No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person * * * or cause mental distress to the other person * * *.

(2) No person, through the use of any form of written communication or any electronic method of remotely transferring information, including, but not limited to, any computer, computer network, computer program, computer system, or telecommunication device shall post a message or use any intentionally written or verbal graphic gesture with purpose to do either of the following:

---

objected to the trial court's order on the grounds that it was not supported by sufficient evidence going to each element of menacing by stalking and again challenges the sufficiency of the evidence in his first assignment of error. *See* Civ.R. 65.1(F)(3)(d)(i); *J.R. v. Pless*, 9th Dist. Summit No. 27665, 2016-Ohio-14, ¶ 6.

(a) Violate division (A)(1) of this section;

(b) Urge or incite another to commit a violation of division (A)(1) of this section.

(3) No person, with a sexual motivation, shall violate division (A)(1) or (2) of this section.

R.C. 2903.211(A).

{¶16} A "pattern of conduct" is defined as "two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents[.]" R.C. 2903.211(D)(1). To act "knowingly" is to act, regardless of one's purpose, with the awareness that one's "conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). A person possesses "knowledge of circumstances" if "the person is aware that such circumstances probably exist." *Id*. "When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact." *Id*.

{¶17} To cause "physical harm" to a person means to cause "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). "Mental distress" means "[a]ny mental illness or condition that involves some temporary substantial incapacity" or that "would normally require psychiatric treatment, psychological treatment, or other mental health services," regardless of whether the person sought or received such treatment. R.C. 2903.211(D)(2)(a),(b).

{¶18} We first consider R.V.'s argument that the evidence of record was insufficient to prove the "pattern of conduct" element of menacing by stalking. R.V. contends there were no allegations that he directly communicated with E.V. and that the printout of messages entered into

evidence alleging his communications with third parties was not properly introduced at trial. As to the messages depicted within the document, R.V. asserts that none of these messages were properly authenticated by time, date, or participants, and that no testimony was presented to distinguish between the two or more conversations jumbled within the document.

{¶19} At the full hearing, E.V. testified that she has known of R.V. since 2016, when they sat at the same math table during her sophomore year of high school. She testified that she did not socialize with R.V. outside of that classroom. E.V. testified that, sometime in 2016, R.V. came to her house looking for her on two occasions. E.V. stated that, after her brother told R.V. not to come to the house, he stopped.

{¶20} According to her testimony, E.V. graduated high school and went off to college without further incident until, on December 30, 2019, a person named "Kelsey" contacted E.V. to warn her "that she was scared for [E.V.'s] safety." Kelsey sent E.V. pictures of messages that were the cause for her concern. These messages appear to have been compiled into an 18-page printout entered into evidence as Exhibit 1.

{¶21} The images of the text messages in Exhibit 1 are of very poor quality; some of the text is quite blurry and difficult to read. Several of the pages in Exhibit 1 are duplicates. The messages contained in Exhibit 1 are, ostensibly, not all part of the same conversation, and the messages do not seem to be organized in any sequential or logical order. There is no evidence, neither in hearing transcript nor on the face of the exhibit, indicating the nature of the platforms or forums through which the texts and messages were sent and received. Further, although E.V. testified that she came into possession of the messages in Exhibit 1 on December 30, 2019, there is no evidence to indicate when any of the messages were sent.

{¶22} There are multiple screen names and individual names referenced throughout the messages in Exhibit 1. Aside from E.V.'s testimony as to one of the screen names—Imareal1—there is no testimony to explain who was sending, receiving, or replying to the messages. At the hearing, E.V. testified that she knew Imareal1, the "screen name for most of these texts[,]" to be R.V. According to E.V., a friend of hers previously informed her that Imareal1 was R.V.'s screen name, and Imareal1 made attempts to "friend" E.V. on various social platforms.

{¶23} E.V. testified that she reviewed the text in Exhibit 1, and in response to questions about the messages, E.V. testified as follows:

Q: You reviewed the texts?

A: Yes.

Q: Contains your home address?

A: Yep.

Q: Contains your home phone number?

A: Yep.

Q: Contains pictures of you?

A: Yes.

Q: Messages about you of a sexual nature?

A: Yes.

Q: Indicating he wants to have sex with you?

A: Yes.

Q: Messages that he wants to come to Hudson and get you?

A: Yes.

E.V. testified that those messages left her "[a]bsolutely terrified that he was going to show up at [her] house within like at least the next few days or next few weeks to come and get [her] or whatever." However, E.V. did not testify as to any particular messages or statements by R.V. indicating that he would "get" her, nor did E.V. provide any testimony or explanation as to what she believed R.V. might have intended in making a statement that he wanted to "get" her. E.V.'s testimony did not provide any substantive detail regarding the messages.

{¶24} Per this Court's review of Exhibit 1, starting on page three and continuing through page 14, there are conversations between "Imareal1" and one or more unidentified individuals who appear labeled as "ME" in the text. On the third page of Exhibit 1, Imareal1 informs the unidentified other party to the conversation that he found a high school classmate who "know[s] the girl[.]" Imareal1 tells the other individual, "So [you] and me will go to Hudson tomorrow" and "we can bring Kelsey too." Imareal1 also questions whether they should "bring one more person" besides "Johnny."

{¶25} On the fourth page, there is a message that states, "But we have to somehow reach [E.V.]" before she leaves for her university. Another message on that page says, "We need to get [E.V.] fr (sic)" and includes the word "please" followed by indiscernible emojis. The name of the individual sending these messages is not legible, nor is it clear to whom the messages were sent. Throughout several other pages, Imareal1 explains that he cannot stop thinking about E.V. and writes "the thing is that like I really care about her and I need her to know that fr (sic)[.]" Imareal1 suggests reaching out to friends of E.V. through Snapchat and Instagram to "reach E.V. so it doesn't seem creepy[.]" At pages 8 and 9 of Exhibit 1, in his conversation with an unidentified individual, Imareal1 questions whether he should just show up at her house to meet E.V. in person, call her parents, or continue to reach out to her through friends. On page 14 of Exhibit 1, there is

a partially legible message, presumably written by Imareal1, stating, "And the last time I went to her house her brother was furious and threatened to call the police. And I think her parents are pissed too. So it's like confusing[.] And I think she has a negative view on me based on me getting in trouble in high school[.] But I'm not going to give up easily tho[ugh.]"

{¶26} The texts in the section of messages in the third through the fourteenth page of Exhibit 1 do reflect that Imareal1—the only name in the messages ascribed to R.V.—contemplated going to E.V.'s house and expressed his desire to "get" her. However, an interpretation of his desire to "get" her as being a threat to her safety is somewhat dubious both on its face and within the context of the of the other messages presented as evidence. This section of messages does not contain E.V.'s home address or phone number, and it is unclear whether any of the photographs in Exhibit 1 were sent as part of a message or whether they were sent by Imareal1. Moreover, there are no messages of "a sexual nature" or messages indicating a desire to have sex with E.V. contained in this section of messages.

{¶27} Next, we look to the messages depicted on the first and second page of Exhibit 1 and the messages on pages 16[2] through 18, which are distinct in appearance from the messages in pages 3 through 14 and appear to come from a different forum or platform. The images on each of these pages contain either the words "TELLONYM," "Send a Tell," or "tellonym.me" but there is no evidence or testimony in the record to explain the significance of these words. The first page of Exhibit 1 shows a message sent by "Lp2002" listing an address and a phone number and making an explicit statement about how hot "she" is and describing the author's inability to control his sexual attraction. Another message appears at the bottom of this page apparently responding to

---

[2] Page 15 of Exhibit 1 is a copy of a portrait. It contains no text or other marking, and the context of the photo is not apparent.

and chastising Lp2002 for "discussing someone's [a]ddress and phone number online[.]" The second page of Exhibit 1 differs in appearance from the first page, and there is no indication who wrote the messages on this page. There was no evidence offered at the hearing to identify either Lp2002 or the author of the reply message, to explain the type of forum or platform in which these messages were sent, or to indicate when the messages were sent. The messages do not directly reference E.V. and, although E.V. responded in the affirmative during her testimony when counsel asked generally if "the texts" contain her home address and her home phone number, she presented no testimony as to the contents of any particular message and did not testify as to her actual address or phone number.

{¶28} Page 16 of Exhibit 1 is essentially a duplicate of the second page but contains the name "Phil Thompson" at the top of the page. There is no evidence to suggest who Phil Thompson is. The last two pages of Exhibit 1 also have "Phil Thompson" listed at the top, and those two pages each contain a single text box, but no indication who wrote the text. The text box on page 15 contains the statement "[yo]u need to know because she [] amazing as f**k" and a reply stating, "Well then tell her that and not me[.]" The final page of Exhibit 1 depicts text stating, "I wish I could f**k [E.V.]" and a reply stating, "Idk who [E.V.] is??? And why must I know about this?"

{¶29} None of these sexually explicit statements appear to have been sent by Imareal1. There is no testimony or other evidence connecting these messages to R.V. E.V. did not provide any testimony regarding these messages, and there is no evidence in the record to show who was involved in these text conversations or when the conversations occurred.

{¶30} At the hearing, Officer Dinda testified that E.V. filed an incident report on January 2, 2020, against R.V. The report was admitted into evidence as Exhibit 2. Upon questioning about Exhibit 1, Officer Dinda stated that he reviewed the messages and agreed that the messages were

"sexual in nature" and contained R.V.'s "desire to get to" E.V. Officer Dinda did not testify that he had any personal knowledge regarding Exhibit 1, only that E.V. had showed him the document when she filed her report.

{¶31} Officer Dinda testified that he reached out to R.V. and, on January 6, 2020, R.V. came into the police station to discuss the matter. Officer Dinda summarized his conversation with R.V. as follows:

> Basically I -- I kept it really short. I told him that, you know, [E.V.] wants to have no contact with him. She's not interested in speaking with him, meeting him, any kind of relationship with him. Told him that he's kind of walking the fine line of -- of a -- of a stalking issue. And that he needed to just break off all attempts of communication. Kind of -- I think I believe I told him forget that she exists. Forget her name. And he would -- the case would be over at that point.

According to Officer Dinda, R.V. attempted to respond with a claim that his devices had been hacked. However, Officer Dinda told R.V. he "wasn't going to argue with him and try to get into it with him on that" and told R.V., "Just stop and everything will be okay at that point."

{¶32} Officer Dinda indicated that, during their meeting, R.V. "just became completely silent and exhibited just a complete, blank stare." Concerned about R.V.'s nonresponsive behavior, Officer Dinda contacted R.V.'s mother, who came into the police station and explained that R.V. "shuts down" and said "he does that and that's kind of a normal thing for him." Officer Dinda testified that he reiterated to the mother what he had just explained to R.V., that "if he just stops communicating about her, * * * leaves her alone completely, nothing more will come of it." According to Officer Dinda, R.V. left the station—after shouting an expletive on his way out. Despite his warning that "nothing more will come of it" so long as R.V. left E.V. alone, Officer

Dinda testified that he contacted E.V. following his meeting with R.V.[3] and advised her, based on his observation of R.V.'s behavior during the meeting, that it was "probably in her best interest" to file for a CSPO.

{¶33} While "explicit or direct threats of physical harm are not necessary to establish a violation of R.C. 2903.211(A)[,]" a petitioner must show that "the offender, by engaging in a pattern of conduct, knowingly caused another to believe the offender would cause physical harm or mental distress to him or her." *Noah v. Brillhart*, 9th Dist. Wayne No. 02CA0050, 2003-Ohio-2421, ¶ 15. E.V. had the burden to prove, by a preponderance of the evidence, that R.V.'s conduct constitutes menacing by stalking before the trial court could grant the CSPO. *A.S.*, 2013-Ohio-4857, at ¶ 6. To meet this burden as to the "pattern of conduct" element of menacing by stalking, E.V. was required to show that R.V. engaged in "two or more actions or incidents closely related in time * * *." R.C. 2903.211(D)(1). "Because R.C. 2903.211(D)(1) does not elaborate on the requirement that the incidents must be 'closely related in time,' that question must be considered with reference to all of the surrounding circumstances." *R.C. v. J.G.*, 9th Dist. Medina No. 12CA0081-M, 2013-Ohio-4265, ¶ 12.

{¶34} First, per this Court's review of the of record, we must conclude that there is no evidence to show that R.V. made any sexually explicit statement regarding E.V. More specifically, there is no evidence to show that any of the sexually explicit statements in Exhibit 1 were sent or posted by R.V. E.V. testified only as to her belief that the screen name "Imareal1" belonged to R.V., and those messages in Exhibit 1 that are sexual in nature do not appear to have been made by Imareal1.

---

[3] We note that Officer Dinda testified that he spoke with R.V. at the station on January 6, 2020. However, the record reflects that E.V. filed the petition for a CSPO three days prior, on January 3, 2020.

{¶35} Next, even if this Court were to accept E.V.'s testimony as sufficient to identify "Imareal1" as R.V., we would be left to consider only the statements attributable to Imareal1 as evidence of the pattern of conduct prohibited by the menacing by stalking statute. However, there is no evidence in the record as to when R.V. sent or posted any messages pertaining to E.V., nor is there evidence to suggest that he engaged in a pattern of conduct through his conversation or conversations about wanting to reach out to or "get" E.V. Even if we assume, without deciding, that R.V.'s communications concerning E.V. are of a character sufficient to show that R.V. engaged in conduct *knowing* that such conduct was likely to cause E.V. to believe that R.V. "will cause physical harm" to her, or knowing that such conduct was likely to "cause mental distress" to E.V., the evidence does not show a pattern of two or more incidents of such conduct closely related in time.

{¶36} In the order adopted by the trial court granting the CSPO, the magistrate found as follows:

> [E.V.] testified as to the sexual threats that [R.V.] has made against her. Exhibit A (sic)[4] establishes a pattern whereby [R.V.] repeatedly indicates his desire to have sexual interactions with [E.V.]. Exhibit A (sic) also establishes that [R.V.] has solicited others to help him "get" [E.V.]; that he is not going to give up; and that he knows [E.V.]'s home address and telephone number. [E.V.] testified that, as a result of the threats that have been made against her, she is in fear for her safety and has altered her lifestyle as a result of this continued fear. Exhibit B (sic), prepared by Officer Dinda, corporates (sic) the sexual threats as set forth in Exhibit A (sic).

As we discussed in the preceding paragraphs, the record does not support the finding that E.V. provided any testimony that R.V. made any sexual threats against her. Nor does the evidence of

---

[4] The magistrate refers to Exhibit A and Exhibit B, however, there are no such exhibits in the record. Presumably, this is a typographical error and Exhibit A was an intended reference to Exhibit 1, while Exhibit B was an intended reference to Exhibit 2.

the record establish a pattern of R.V. repeatedly indicating his desire to have "sexual interactions" with E.V. Even if the evidence could support a finding that R.V. engaged in a conversation or conversations wherein he expressed his desire to "get" E.V. and sought the assistance of others to meet her or attain her in some way, the evidence was not sufficient to show a pattern of conduct. In the absence of such evidence, we must conclude that the trial court erred by finding that R.V. engaged in a pattern of conduct as required under R.C. 2903.211(D)(1).

{¶37} We need not address R.V.'s remaining arguments contending that there was not sufficient evidence as to the knowing and causation elements of menacing by stalking. Because E.V. did not meet her burden to establish a pattern of conduct—an essential element of menacing by stalking—by a preponderance of the evidence, we must conclude that it was error to grant the CSPO.

{¶38} R.V.'s first assignment of error is sustained.

### Assignment of Error II

**The trial court erred when it permitted testimony that should have been excluded as inadmissible hearsay, speculation and conjecture.**

### Assignment of Error III

**The trial court erred violating R.V.'s due process rights by conducting the hearing without [R.V.] after being contacted by [R.V.]'s counsel that he was delayed in another hearing.**

{¶39} In the second assignment of error, R.V. contends that the trial court erred by admitting hearsay at the full hearing. In the third assignment of error, R.V. argues that his due process rights were violated when the full hearing went forward despite a phone call notifying the court that R.V.'s attorney was unavoidably delayed. In light of our resolution of his first assignment of error, we conclude that these arguments are moot and, therefore, we decline to consider them. App.R. 12(A)(1)(c).

III.

{¶40}  R.V.'s first assignment of error is sustained.  R.V.'s second and third assignments of error are moot.  The judgment of the Summit County Court of Common Pleas is reversed and the protection order is vacated.

Judgment reversed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.


_____
JULIE A. SCHAFER
FOR THE COURT


HENSAL, J.
CONCUR.

CARR, J.
CONCURS IN JUDGMENT ONLY.

APPEARANCES:

ELI R. HELLER and CORINNE SIX HOOVER, Attorneys at Law, for Appellant.

THOMAS SAXER, Attorney at Law, for Appellee.